Good morning, Your Honors. I'm Judith Wood for the Appellate. I'd like to start out with asking some questions, if I may. My understanding is that you and the government are in agreement that this matter might be dismissed and that it could be remanded for repapering. That is one of the choices. I believe there are – there is another choice before the Court, since we are here. It could – the decision of the immigration judge and the board could be reversed. And Mr. Kabatera – Yes, I understand all that, but I'm just simply inquiring to make sure we know exactly where we stand. But there is this agreement between you and the government. Yes, I believe that would be a good alternative. He is statutorily eligible for cancellation. There would be severe and unusual hardship, extremely unusual and severe hardship, to two people now, not only his child, but also his wife, who's recently become a lawful permanent resident. Now, my understanding is that if it's remanded for repapering, it simply starts the process over again, and your client could apply for cancellation. That is correct, Your Honor. And he did actually make that application below. All right. Now, what are the distinctions in the remedies and the consequences of cancellation versus a grant of asylum? When a person is granted asylum, they wait one year, and then they file for adjustment of status. They file a 45. It takes – it used to take quite a long time, perhaps 10 years, for a person to adjust status. That has been changed now, and it may take between two and three years for him to adjust status on his asylum claim. In the meanwhile, the wife has recently become a lawful permanent resident. She, of course, will petition for him, and that petition will become upgraded when she, in fact, becomes a citizen. So he would adjust status to that of lawful permanent resident. Is that what he would adjust status to? When you say he would adjust status? Well, there's a wait. When someone becomes an asylum – I understand that, but what – after – what does he become? What does the adjustment result in? A lawful permanent residency. That's what I was going to say. Adjustment to lawful permanent residency. All right. Okay. And with cancellation – With cancellation – With cancellation, what happens is if he comes – if he is able to prove that there's an extremely unusual and severe hardship to the relatives, the son and the wife, that results in an automatic – not an automatic. There are always considerations, but a relatively quick, perhaps several months, and then he gets his passport stamped and he's a lawful permanent resident, receives what commonly is referred to as a green card. After the cancellation, that's what the status is. Is that right? That would definitely be quicker if he's granted. Yes, right. And he has a young son and a wife who's a refugee from Uganda. She came in. Yes, we understand that. We have the record. But now you may proceed with your argument on the asylum claim. Well, on the asylum claim, I think that he actually did prove past persecution. Because several – he was arrested twice. He was beaten. He has scars all over his body. He was burned. His knees were badly injured. His – Counsel, the question in my mind actually is nexus, and that is a protected ground. As I understand the record, there is some question that there are – different inferences can be drawn about the reason for the arrests and the beatings and the other bad things that happened to him. One of those is imputed political opinion or political opinion. But isn't it also possible to draw an inference that these things happened because of illegal public meetings that he held? Well, these were not illegal meetings. They were meetings of a group whom he refers to as being the well-wishers, which was sort of a – Well, it certainly wouldn't be illegal here. But my understanding of the record was that that kind of meeting in that country at that time was illegal. Well, you know, this restaurant was his family business. It was almost like an extension of his home. And the people that attended these meetings were friends. So it wasn't quite a public meeting. I think the situation in Uganda was so terrible, and the slightest suspicion gave rise to torture, which is in fact what happened, the slightest suspicious activity. This was not very egregious activity. It wasn't like he was leading a demonstration or protesting in any kind of public forum. He knew the score in Uganda. He knew that if he was too vocal, he would really probably get killed. So he kept things rather muted. Only they had this charitable meeting in the restaurant to help people who were in trouble, you know, help them with their rent, medical, whatever came up. So that's why it isn't exactly a political opinion that he demonstrated. Rather, an imputed political opinion was attributed to him. Also, his father, remember, his father was in the prior government and was a parliamentarian. That father was arrested, tortured, and died. And this is his son, who continued the family tradition, not in terms of government participation, but in terms of his participation in a charitable organization. He wasn't active politically himself, though. No, he refrained from that. He definitely, I believe he was quite afraid of being active politically. It's clear that when they picked him up, they kept questioning him as to his views about the government and politics. Is that right? Right. And he refrained from expressing his political opinion. To this day, he refrains from expressing his political opinion. He only expresses his terror, his fear of the government in Uganda. He doesn't actually say this one is right, that one's wrong, or what he actually thinks in terms of the political strategy which should happen in his country or any kind of path. He just wanted to get away because he was afraid, mainly because of what happened to his father. And the two instances of torture which he suffered, the second being more egregious. This man has scars all over his body. He's been seriously wounded. But the point which Judge Graber is making is that there has to be a political opinion imputed to him for him to be able to take advantage of the asylum claim. Well, he definitely has an imputed political opinion because the government imputes the opinion. The government is the one who imputes the opinion, and they obviously thought he had an opinion. That's why they tortured him. That's why they arrested him. That's why they surveilled him. Counsel, do you want to save some rebuttal time? Yes, thank you. Good morning. May it please the Court. My name is Cindy Farrier, and I'm representing the Attorney General in this matter. You heard me ask about the consequences of remanding for repapering. Do you have anything to add to what the opposing counsel has indicated? Not specifically. We do renew our request, again, for remand today. We believe that it's appropriate in light of the Court's decision in Alcraz, which the Board didn't have the benefit of in considering when it made its own decision. And in light of that decision in Alcraz, where it was suggested that the agency should consider whether it has an obligation pursuant to internal policies, whether it must administratively close. That, in conjunction with the fact that the Department of Homeland Security has indicated that it has no objection to the remand of the case to the Board to administratively close for repapering, we believe that's appropriate. Now, if we were to remand for repapering, could we hold in abeyance here his petition for asylum? I do not believe so, because the Court, if it remands, I haven't ever heard of it, remanding just a portion of the case and keeping another portion. But it wouldn't necessarily, if it goes back to the Board, the Board then would be able to reopen for all purposes. And in fact, we've also asked for remand so that the Board could reconsider its findings with regard to asylum. That is, considering specifically making its findings with regard to past persecution perhaps more clear. We can instruct the Board to look into those matters again, can't we? Yes, you could. On remand, you can instruct. We don't think the evidence is clear. Yes, you could do that. However, I guess in this case, our point is that… Let me ask a question going to that. I believe the immigration judge here found there was no past persecution, right? Correct. He didn't explain that. He didn't say why. He didn't say what happened wasn't persecution. Or he didn't say there was no nexus to one of the protected grounds. He didn't specify. We don't really know what his logic was there. He didn't state specifically that it was not on account of. He did relate to the evidence that the petitioner had provided and made the conclusion that there was no past persecution. From the evidence, which he… What did he mean by that? Did he mean what was done to this person didn't amount to persecution or lack of nexus to politics or what? Well, that was, again, Your Honors, that's why we requested remand. We believe that the decision could be clearer as to that. However, the board did clarify that its reading of the record showed that it wasn't on account of, meaning that it affirmed the IJ's decision on the finding of past persecution and no well-founded fear of future persecution because he hadn't shown the on-account-of ground. And that is evident from the record as we've pointed out. Well, how did the board explain it specifically? I don't remember that. Oh, well, in saying it specifically, what I mean is that when it affirmed, it said we find that the IJ correctly concluded that it is inadequate to meet his testimony, is inadequate to meet his burden of proving past persecution or well-founded fear of future persecution on account of a qualifying ground. Counsel, it's my understanding that the requirements for a CAT claim do not include on account of. Correct. So that that wasn't really considered by the IJ, although there was a claim for it. Is that correct? The immigration judge did, in fact, make a finding with regard to the torture convention relief or protection. He found that it wasn't shown in this case. Although he didn't state specifically that CAT protection does not require the on-account-of. So he really didn't, as I read it, he really didn't distinguish the various bases for. He didn't set forth with specificity on what. He did say specifically that he didn't find that there was any evidence in the record that the government or persons that the government were controlling or would acquiesce to torture, I guess. There was no finding that it was going to be on behalf of the government that there would be torture. So on that basis, then, that alone could be enough to show that there's no CAT protection. So the on-account-of necessarily finding that wouldn't be with CAT wasn't necessarily addressed, but doesn't necessarily need to be in this instance. So. You raised this issue of imputed political opinion. Did they blow? That hasn't been directly raised at all by anybody. Whether it was imputed or not, no. In fact, before the immigration judge, it was quite clearly stated that Petitioner didn't have a political opinion, that he, in fact, was not politically active, that any opinion that may have been imputed or any, I guess, not imputed, but the actions of his father, which had occurred, he definitely was politically active, his father was, but his father had been dead for four years prior to his arrest, and he hadn't had any problems in between that time. It was only after he got active with this well, whatever it was, that the government became interested and had, I guess, some, I don't know whether you want to call them spies or whatever, at those meetings in the restaurant. That's what he believed, that's what he asserted, yes. But again, as was made clear, in fact, he stated in the record that public meetings were unlawful at the time, and this was a public meeting. Well, that's an issue in this case, apparently. It was, they were all held within the restaurant, gathering of people, and his assertion, I think, is that the prohibition was against meetings outside in the square or whatever, so this was a meeting of friends and acquaintances in the restaurant, so it could hardly be considered to be a public meeting. Well, he did say that it was open to all, and that they spread the word through, it was through word of mouth that the meetings, meeting times and the place were spread to everybody. He didn't indicate that it was closed by any means. It certainly was held within his restaurant, but his restaurant was a public restaurant. What is the law on this question? If he wasn't politically active, but the government thought that he was, does that establish an excess provision? He has to show that. That's imputed. Yes, he would need to make. Does that meet the statutory standard? If it's imputed, yes, that would be enough. However, you have to make at least some showing, even under this court's case law. He said that when they tortured him, they were trying to get him to state that he was involved in politics. He does say that they were asking him about that. That is true. There doesn't seem to be any other real reason for them torturing him, unless they were concerned for his possibly being involved in anti-government activity. Well, that's a possible conclusion. However, it's not clear from the record that that is in fact what they were doing, but rather maybe, again, that public meetings were unlawful. It's okay to torture people for public meetings? I'm not saying that at all by any means, but I'm saying that the Ugandan government may have, in arresting him, that may have been the reasoning for it. So, again, we would just, again, renew our request for remand of this case, both with regard to the repapering issue and the past persecution finding. We think that repapering, however, is one that's actually something that is required before the court should make a finding with regard to that. So, thank you very much. Thank you. Ms. Wood, did you wish to rebut? Should the court find that Mr. Kabaderein suffered past persecution, the issue becomes future persecution. The judges seem to state that Uganda was better now. In fact, country reports indicate that torture is still going on in Uganda and that civilians are regularly tortured in prisons and by the officials in Uganda. And during the course of the hearing, the Respondent was asked, do you have any kind of fear of returning? And he said, yes. He said that the policies have never changed. And, in fact, Musevni is still in power and the police chief is still in power. So the very same people who caused his father great harm and his eventual death and caused bodily and great psychological harm to Mr. Kabaderein are still in power. And, therefore, it can definitely be inferred that he would suffer future persecution in Uganda. Was he burned with a cigarette? Yes. I'm not sure exactly what the implement of the burning was. I do know that he was hit on the knees with sticks and that he was burned. I'm not sure exactly what the implement of the burning was. Well, the record is a little bit ambiguous on that. At one point he said it was cigarette burns, apparently. Cigarette burns. Yes, now, yeah. On his chest and on his abdomen, right, during the course of the interrogation. Let Judge Fletcher complete her sentence. When the judge is speaking. Oh, I'm sorry. The psychiatrist said that it was some type of hot metal. So it's a little unclear as to. As I recall, they had some sort of like a rod that they had heated up and put on his body. And they used a stick or rods to also perhaps the same rods to hit his knees with. So it was during the course of interrogation as to his political opinion, which definitely brings him into the cat arena. But I think in this case it would be better to grant asylum. And that would be the first choice. The second choice would be cancellation because under cat he'd be in limbo. He'd only have withholding until such time as his wife's petition became available to him. Counsel, your time has expired.  The case just argued is submitted. And we will move next to Abraha v. Gonzalez.
judges: B. Fletcher, Cudahy , Graber